**SUN PUB. CO. v. WALLING, Wage and Hour Administrator.**

No. 9483.

Circuit Court of Appeals, Sixth Circuit.

Jan. 24, 1944.

Elisha Hanson, of Washington, D.C. (Elisha Hanson, of Washington, D.C., and C. E. Pigford and W. N. Key, both of Jackson, Tenn., on the brief), for appellant.

Bessie Margolin, of Washington, D.C. (Douglas B. Maggs and Bessie Margolin, both of Washington, D.C., Jeter S. Ray, of Nashville, Tenn., and Mortin Liftin and Faye Blackburn, both of Washington, D.C., on the brief), for appellee.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

· SIMONS, Circuit Judge.

The appellant was enjoined from violating §§ 15(a) (1), 15(a) (2), and 15(a) (5) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 215(a) (1, 2, 5), and in its appeal challenges the application to it as a newspaper publisher, of the several sections of the Act, and, if applicable, their constitutional validity in view of the First and Fifth Amendments.

The appellant publishes The Jackson (Tenn.) Sun, a newspaper with a circulation of 9,000 daily and 11,000 on Sunday. Approximately 200 copies of each edition are sold outside of the state. An added number of copies are sent extrastate as complimentary or to national advertisers for confirmation of their advertisements. The newspaper is a member of the Associated Press and not only receives news from it but transmits to it news items originating in its own territory. It also receives news from the United Press Association, receives from out of the state the comic supplement which it distributes with its Sunday edition to both local and outside subscribers, and uses syndicated articles sent to it by mail from various national services. It carries a substantial volume of national advertising for out-of-state producers and distributors who usually send it their mats or electrotype plates for printing. Substantially all of its paper and other materials are shipped to it from outside the state. Its employees include the writers and reporters who gather, compose and edit the news stories and write headlines, the linotypers and stereotypers, pressmen, subscription and circulation employees, and the like. The court found upon substantial evidence, that the appellant, in respect to various classes of its employees, failed to comply with the statutory provisions governing wages and hours and the keeping of records. It decreed that the appellant be restrained from violating the provisions of §§ 15(a) (1), 15(a) (2) and 15(a) (5) of the Act, that it shall not, contrary to § 6, pay its employees less than the statutory minimum wages, and shall not, contrary to § 15(a) (1), ship, deliver, transport, offer for transportation, or sell in interstate commerce, any goods in the production of which any employee has been employed at rates of pay less than those specified in the decree, and shall not fail to keep and preserve records as required by the regulations of the Administrator.

The appellant assails the decree on numerous grounds. With a single exception, to be hereinafter considered, its defenses may be dismissed without extended discussion, either as being foreclosed by controlling authority or lacking in persuasiveness. Its allegedly controlling contention is that the press is immune from Congressional regulation by virtue of the terms of the First Amendment which provides that "Congress shall make no law * * * abridging the freedom of speech, or of the press; * * *". It is quite clear, upon a consideration of Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 656, 81 L.Ed. 953, and the cases therein cited and discussed, that this view must be rejected. Not even the dissenting opinion in the case lends support to it, based as it is solely upon a consideration of the right of the Associated Press to be freed from the hazard of a biased distortion of news on the part of an employee shown to have strong sympathies upon vital questions.

While the Associated Press case involved the impact of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., upon the news distributing business, the argument that Congressional regulation impinges upon freedom of the press was precisely the same as that here invoked. The court there said, "The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others. He must answer for libel. He may be punished for contempt of court. He is subject to the anti-trust laws. Like others he must pay equitable and nondiscriminatory taxes on his business." True,

448

it is, that the enforcement of the present law may drive an economically marginal newspaper to the wall, but the same may be true of an increase in taxation or a judgment for libel, and the Constitutional immunity is not a guaranty to a newspaper publisher of economic security, or a sanction to free him from the business hazards to which others are subject.

■ Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, and Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 82, are not contra since they involve ordinances imposing direct and discriminatory license taxes on the distribution of literature, and Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, condemned a statute which directly prohibited distribution of handbills and imposed a limited censorship on the literature permitted to be distributed. Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, involved a statute which imposed a form of pre-publication censorship. All of these cases involved attempted interference with the right of free expression. We are concerned with nothing of that kind in the enforcement of the Fair Labor Standards Act. As observed in Overstreet v. North Shore Corp., 318 U.S. 125 at page 131, 63 S.Ct. 494, the Act aims at protecting commerce from injury through adjustment of the master-servant relationship by eliminating substandard working conditions. It is doubtful that newspaper publishers generally would conceive, or, so conceiving, declare that the guaranty of a free press includes the right to maintain such conditions. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 449, 80 L.Ed. 660, which held invalid a Louisiana tax on advertising of all newspapers with circulation greater than 20,000, is a closer case, but this was a discriminatory tax laid on newspapers, applicable to no other business, and there the court specifically declared, "It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of taxation, but one single in kind, with a long history of hostile misuse against the freedom of the press."

■ Nor does the Act violate the Fifth Amendment by classifying newspapers in respect to frequency of issue and circulation so long as the classification appears to be reasonable. Steward Mach. Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441. The first case held the Social Security Act, 42 U.S.C.A. § 301 et seq., valid although it exempted employers of fewer than eight persons, and the second held that Congress could validly apply a tobacco grading and inspection law only to the larger markets. Administrative necessity would seem to require some classification, and we are unable to say that a Congressional exemption of weekly or semi-weekly newspapers with circulation of less than 3,000, the major part of which is within the county where printed and published, is not a reasonable exemption in view of the social good aimed at, and the desirability of efficient administration.

■ The contention that the Act is not applicable to the appellant's business because its employees are not engaged in commerce or the production of goods for commerce, must be rejected on the authority, among others, of Associated Press v. N. L. R. B., supra. Likewise it is unimportant that only a small percentage of appellant's newspapers are sent out of the state. United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A. L.R. 1430; Chapman v. Home Ice Co., 6 Cir., 136 F.2d 353. The Act, by its terms, is applicable to newspapers generally because by its express terms it exempts weeklies and semi-weeklies and those with circulations less than 3,000.

■ The business of the appellant is not exempted under § 13(a) (2) as a "retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." In the broader sense, every business is of service to the public, but as the term "service" is used in the Act the type of business exempted as a service establishment is comparable to "barber shops, beauty parlors, shoe-shining parlors, clothes pressing clubs, laundries, automobile repair shops," or the like. Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572, affirmed 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. Certainly public utilities which are frequently referred to as public service corporations, are not therein exempted. Moreover, the Act itself clearly distinguishes newspapers from the type of service establishment exempted by reason of its specific exemption of certain types of

newspapers. Had all newspapers been placed outside of the Act by § 13(a), it would have been futile to incorporate the more particularized exemption.

Section 13(a) provides that §§ 6 and 7 shall not apply with respect to "(1) Any employee employed in a bona fide executive, administrative, professional, or local retailing capacity * * * (as such terms are defined and delimited by regulations of the Administrator)." Regulation 541.1 defines executive as any employee whose primary duty consists of the management of an establishment or of a customarily recognized department who regularly directs the work of other employees, has authority to hire and fire, exercises discretionary powers, is compensated at not less than $30 per week, and whose work of the nature of that performed by non-exempt employees does not exceed 20 percent of the number of hours of work by other employees under his direction. The court found, upon evidence that we deem substantial, that the appellant's composing room foreman, Kersh, spent about 80 percent of his time in working with the men and only 20 percent in genuine administrative duties. The regulation is attacked as arbitrary and capricious. It is, however, a regulation which the Administrator was empowered to adopt by the express sanction of Congress, and we have been advised repeatedly that such administrative decisions must be upheld except in cases of flagrant abuse. Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589; National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344; Switchmen's Union of North America v. National Mediation Board, 64 S.Ct. 95, 88 L.Ed. ——; Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. R. Co., 64 S.Ct. 146, 88 L.Ed. ——; Brotherhood of Locomotive Engineers v. Southern Pacific Co., 64 S.Ct. 142, 88 L.Ed. ——, the last three cases decided November 22, 1943. The Act exempts those engaged in professional employment and the Administrator requires that to qualify as professional an employee's work must be of a nature usually prepared for by a long course of specialized training and must carry a salary of at least $200 per month. The court rejected opinion evidence that reporters and editors are professional workers, and it is contended that this regulation also was arbitrary or capricious. It was, however, shown, and it is, perhaps, common knowledge, that few newspaper employees are graduates of specialized schools of journalism, and there are editors of long experience and trained judgment who, agreeing that "the proper study of mankind is man," likewise believe that the only practical school of journalism is the newspaper office.[1]

We come then to the one challenge to the decree which, because of its importance, may not summarily be dismissed. Section 17 of the Act grants jurisdiction to the District Courts to restrain violations of § 15. Section 15(a) prohibits the transportation or delivery in commerce of any goods in the production of which an employee was employed in violation of §§ 6 or 7 which deal with failure to pay minimum wages. Since the distribution of newspapers out of the state constitutes a shipment of goods in interstate commerce, § 17 would seem to give sanction to the injunctional order of par. 3 of the decree which restrains the defendant therein from delivering or transporting or selling in interstate commerce any goods in the production of which its employees have been employed at rates less than those specified in other sections of the decree, and this squarely raises the question whether, in the enforcement of a regulatory measure of the type here involved, no conviction upon a criminal charge having been had in trial by jury or to the court upon written waiver of a jury, one may be deprived of the fundamental right to disseminate information or opinions, either within or without the state, a right within the connotation of the freedom of speech and of the press. No case has been cited and none has been found by independent research which holds that a newspaper may be barred from the channels of commerce as a means of effectuating an administrative regulation, or a court decree enforcing an administrative order. If the Congress has the power to withdraw from a newspaper publisher the right to disseminate news and opinions as a means of compelling compliance with law, then it has likewise the power to withdraw from newspaper publishers, and all others, any or all of the fundamental rights preserved by the Constitution. This is not to say that the Congress is impotent to enforce the Fair Labor Standards Act or any other regula-

---

[1] Bingay; Detroit Free Press; Aug. 27, Oct. 12, 1943.

tory measure, nor that it has failed to provide for its enforcement both by criminal penalties upon conviction and by civil remedies after judgment, but permissible enforcement does not include withdrawal of Constitutional immunities in the absence of conviction, or plenary judgment in accordance with due process of law. Section 17, as here applied, does not deal with punishments; it provides for no punishment except in cases of contempt for violation of the court's order, but for suppression and injunction which is a restraint upon publication. Near v. State of Minnesota, supra. The main purpose of such Constitutional provisions is to prevent previous restraints upon publications, they do not prevent subsequent punishment. Patterson v. State of Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann. Cas. 689.

It is true that publications have been barred from the mails because seditious, United States ex rel. Milwaukee v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704, or obscene, Tyomies Pub. Co. v. United States, 6 Cir., 211 F. 385, or because they contain illegal advertising, In re Rapier, 143 U.S. 110, 132, 12 S.Ct. 374, 36 L.Ed. 93, or because intended to influence a court's decision, Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186. But there is no precedent in such cases for the breadth of the injunction in the present decree. Newspapers and others publications are granted low postal rates in pursuance of the traditional policy of the government to grant special favors to publishers because of their contributions to the public welfare. United States ex rel. Milwaukee v. Burleson, supra; Lewis Pub. Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190. They are granted the second class mailing privilege only when the Postoffice Department is satisfied that the publication contains nothing other than "mailable matter," and it has repeatedly been held that the power to suspend or revoke such second class privilege is a necessary incident to the power to grant it. Smith v. Hitchcock, 226 U.S. 53, 57, 33 S.Ct. 6, 57 L.Ed. 119; Houghton v. Payne, 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888. The effect of the presently ordered injunction is not the mere withdrawal from the appellant of the second class mailing privilege which may be withdrawn only by the Postoffice Department, but it is to close to it all the channels of commerce. It is also true that the Supreme Court has, upon occasion, upheld injunctions against that type of expression denominated as "picketing," but in these cases picketing was either accompanied by violence or took place in a setting of violence. Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200. The present case shows no such circumstance. It is clear that mere expressions of opinion not rising to the stature of coercion may not be restrained. N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 479, 62 S.Ct. 344, 86 L.Ed. 348; N. L. R. B. v. Ford Motor Co., 6 Cir., 114 F.2d 905, certiorari denied 312 U.S. 689, 61 S.Ct. 621, 85 L.Ed. 1126. The injunction ordered by the decree below restrains the appellant from distributing its newspapers in interstate commerce, and may not, in its present breadth, be sustained.

This is not to say, however, that § 17 of the Act which empowers District Courts to grant injunctions for violations, is constitutionally invalid merely because in a negligible number of instances it may so be applied as to trespass upon constitutional immunity. We are not obliged to strike it down. "It is elementary law that every statute is to be read in the light of the constitution. However broad and general its language, it cannot be interpreted as extending beyond those matters which it was within the constitutional power of the legislature to reach." McCullough v. Commonwealth of Virginia, 172 U.S. 102, 112, 19 S.Ct. 134, 138, 43 L.Ed. 382.

We are not advised that the appellant distributes in commerce goods other than its newspapers, such as commercial printing, for example. It will therefore sufficiently serve present purposes if the decree below be amended by adding to par. 3 thereof the following: "Provided that nothing herein shall prevent or prohibit the defendant from shipping, delivering, transporting, or offering for transportation or sale its newspapers in interstate commerce or otherwise," and, as so amended, the decree is affirmed.