FERNANDO SIERRA BERDECÍA, SECRETARY OF LABOR OF THE COMMONWEALTH OF PUERTO RICO, in representation and for the benefit of laborer EDUARDO CASTELLAR, Plaintiff and Respondent, v. MARIO MERCADO E HIJOS, Defendant and Petitioner.

No. 11991. Resubmitted January 9, 1959.—Decided May 14, 1959.

*Pedro M. Porrata* and *Charles R. Cuprill* for petitioner. *Domingo Candelario* and *Carlos Bastián Ramos* for respondent and for the Department of Labor.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.
Court.

This is an action involving a claim for wages for extra hours worked. On the basis of the evidence heard at the trial, the Superior Court made in brief the following findings of fact: (1) plaintiff Castellar worked continuously for Sociedad Agrícola Mario Mercado e Hijos on different sugarcane plantations during the period between July 9, 1942 and April 8, 1953; (2) plaintiff's primary duty from July 9, 1942 to April 27, 1949, was that of "timekeeper", although

his duties also included the overseeing of the plantations and the collection of rents from the houses and lots belonging to the defendant; (3) from April 28, 1949 to April 8, 1953, the plaintiff "continued to work for the defendant under the same prior employment agreement but as overseer of Hacienda Buena Vista owned by the defendant"; (4) with the exception of two weeks during which he was absent on account of illness, Castellar's work hours were always: nine hours every day of the week until April 11, 1946, and thereafter nine hours on working days and three hours on rest days; and, lastly, (5) Castellar received a weekly salary which was increased from $10 in 1942 to $23 in 1953, but the defendant never paid him for the extra hours of work.[1]

On the other hand, the lower court set forth as conclusions of law: (1) that Mandatory Decree No. 3 of the Minimum Wage Board was applicable to the work of timekeeper performed by Castellar for the defendant; (2) that on April 28, 1949, when he started to work as overseer of Hacienda Buena Vista, Castellar qualified as an "executive" according to the doctrine announced in *Correa* v. *Mario Mercado e Hijos*, 72 P.R.R. 77 (1951); and (3) that when Regulation No. 13 of the Minimum Wage Board went into effect, namely, January 15, 1952, Castellar ceased to be an "executive," since he was receiving a weekly salary of less than $30.[2] Consequently, it eliminated from the claim all the extra hours worked during the period from April 28, 1949 to January 15, 1952, but it paid to the plaintiff the total amount of $1,717.04 for

---

[1] The weekly salary was $10 from July 9, 1942 to October 1, 1942; $12.50 from October 2, 1942 to May 27, 1943; $14 from May 28, 1943 to January 16, 1946; $17.50 from January 17, 1946 to April 2, 1947; $20 from April 3, 1947 to January 21, 1953; and $23 from January 22, 1953 to April 8 of that year.

[2] Regulation No. 13 defines the terms "executive," "administrator," and "professional" which were excluded from the scope of the Minimum Wage Law by virtue of Act No. 131 of April 27, 1950 (Sess. Laws, p. 336). Among the requirements necessary to qualify as an "executive", it provides that the employee must be compensated for his services "on a fixed basis (by day, week, fortnightly or longer periods) equivalent to a weekly salary of not less than $30, exclusive of board, lodging, or other facilities."

the period during which he worked as a timekeeper, computing the extra hours at the rate of the corresponding salary and applying Act No. 49 of 1935 (Spec. Sess. Laws, p. 538), Mandatory Decree No. 3 on Minimum Wages, and Act No. 289 of 1946 (Sess. Laws, p. 682). It also paid to the plaintiff the total amount of $498.48 for the extra hours worked as overseer from January 15, 1952 to April 8, 1953, applying to this period Decree No. 3 and Act No. 289 of 1946. Hence, it rendered final judgment ordering the defendant to pay to Castellar the sum of $2,209.52, in addition to a like amount by way of penalty or liquidation of damages provided by law. From that judgment Mario Mercado e Hijos filed the present petition for review and in its brief it charges the lower court with the commission of seven errors.

■ The defendant maintains, in the first place, that the provisions of Decree No. 3 are not applicable to the work of "timekeeper" performed by Castellar. The defendant is not right. Castellar was an employee in the agricultural phase of the sugar industry, pursuant to the provisions of par. C-3 of the decree which defines the agricultural phase of the sugar-cane production as follows: "The preparation of the soil, planting, cultivation, harvesting, transportation of the cane if performed by the farmers themselves, and any other operation of an agricultural nature." As shown by the evidence, Castellar's work consisted in inspecting several times a day the sugar-cane plantations for the purpose of verifying personally which laborers were working, what kind of work they performed, and how many hours of work they put in. He kept a record of the names of the workers, the kind of work performed, and the number of hours worked. Then he prepared in the defendant's office the daily report and also the payrolls of the workers. He had no power to hire and dismiss employees, for such function belonged to the majordomo. He did not have under his orders or super-

vision the work of any other employee of the defendant. He did not even have discretion to allocate or assign work to other persons who worked in the fields or in the offices of the defendant. Moreover, he merely performed routinary duties which did not require the exercise of discretion or of independent judgment. Hence, although it is not specifically mentioned in § A–1 of Decree No. 3, his occupation of "time-keeper" is comprised in the general clause of that paragraph which refers to "all kinds of work" in the agricultural phase of the sugar industry.[3]

---

[3] Referring to the minimum wages and working hours in the "agricultural phase" of the sugar industry, § A of Decree No. 3 provides:

"1. MINIMUM WAGES.—Every employer who employs workers in the agricultural phase of the Sugar Industry shall pay said workers, for the different occupations or types of work detailed below, at least, at the following wage rates for the first eight (8) hours of work in any twenty-four (24) hour period, with the exception of those who work as ditch-diggers, ditch-cleaners, ditchloppers and cleaners who work with 'machetes', and axmen cleaning ties in the water and irrigators in non-gravity irrigation systems when working in the water, to whom the minimum daily wage rate applicable shall be for the first seven (7) hours of work during any twenty-four (24) hour period:

| "Occupation | "Rates for other than small and interior farms | Rates for small and interior farms |
|---|---|---|
| "(a) All kinds of work except as classified below | $1.50 | $1.40 |
| "(b) Ditch-diggers; ditch-cleaners; axmen in ditches; ditch-loppers; irrigators in non-gravity irrigation systems when working in the water or in swampy lands; operators of irrigation pumps. | 1.70 | 1.55 |
| "(c) Cane cutters; crane operators; dumpers; plowsteermen; and the cane-cart loaders. | 1.80 | 1.65 |
| "(d) Cartmen in harvest work; portable track handlers; car loaders; and car conductors. | 1.90 | 1.75 |
| "(e) Tractor operators. | 2.20 | 2.05 |
| "(f) Helpers of: carpenters; masons; mechanics; painters; electricians and other manual | | |

We reached an identical conclusion in *Tulier* v. *Land Authority*, 70 P.R.R. 249 (1949), in analyzing the work of another "timekeeper." Thereafter we excluded from the said general clause the majordomos who have under their orders, direct, supervise, and may hire or discharge other agricultural laborers whose occupations are expressly listed in § A–1 of the decree. See *Correa* v. *Mario Mercado e Hijos*, 72 P.R.R. 77 (1951). But the exclusion of majordomos was due to the fact that "*we believe that the Minimum Wage Board did not intend to include majordomos in this general clause, simply because despite the relative importance of the work they perform it would be fixing for majordomos a minimum wage lower than that for the laborers who work under their orders.*" *Ibid* at 83. (Italics ours). *Cf. De Arteaga* v. *Club Deportivo*, 73 P.R.R. 407 (1952). Obviously, this reason can not be invoked here. It will suffice to recall the nature of the work performed by Castellar as timekeeper to be convinced. Consequently, again we ratify the rule laid down in the *Tulier* case *supra:*

| | | |
|---|---|---|
| arts and trades skilled workers. | 2. 40 | 2. 20 |
| "(g) Carpenters; masons; mechanics; painters; electricians, and other manual arts and trades skilled workers. | 3. 25 | 3. 00 |
| ". . . . . . . | | |

"4. HOURS OF WORK:—

"(a) Maximum hours of work per day.

No employer shall employ any worker in the agricultural phase of the Sugar Industry for over eight (8) hours in any twenty-four (24) hour period unless such worker receives compensation for his work in excess of said eight (8) hours, at a rate twice the minimum wage applicable in accordance with the scale established in Section A-1 of this decree; *Provided, however,* that ditch-diggers and ditchloppers, and irrigators working in non-gravity irrigation systems, ditch-cleaners who work with 'machetes' and axmen cleaning ties in the water, cannot be employed for over seven (7) hours in any twenty-four (24) hour period, unless such workers receive compensation for their work in excess of said seven (7) hours at a rate twice the minimum wage applicable in accordance with the scale established in Section A–1 of this decree."

Decree No. 3 includes the work regularly performed by time-keepers in the agricultural phase of the sugar industry.

■ The second assignment of error challenges the ruling that Castellar ceased to be an "executive" when Regulation No. 13 of the Minimum Wage Board took effect. We already pointed out that Act No. 131 of 1950 (Sess. Laws, p. 336) amended § 30 of the Minimum Wage Law for the purpose of establishing as a uniform and general rule that the "professionals, executives, and administrators" would not be entitled to the benefits fixed by the Board in its decrees relating to salaries, work hours, and other working conditions. Conversely, all other laborers, employees, or workers without any exception whatsoever were included in the category of persons entitled to receive the benefits fixed or to be fixed thereafter by the Board in its decrees. However, the Board was vested with power to define by decree or regulation the meaning of the terms "professional, executive, and administrator." And in § 1 of Regulation No. 13, which took effect on January 15, 1952, the Minimum Wage Board adopted the following definition of the term "executive":

"(A) Any employee (1) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof; and

"(2) who customarily and regularly directs the work of two or more other employees therein; or of a department or subdivision thereof; and

"(3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given special attention; and

"(4) who customarily and regularly exercises discretionary powers; and

"(5) who does not devote over 20 per cent of his work week to activities not directly or intimately related to the performance

of the work described in paragraph (A), Subsections (1) to (4) of this Article; *Provided,* that this Subsection (5) shall not apply in the case of an employee who is in the sole charge of an independent establishment or a physically separated branch establishment; or when he owns at least a 20 per cent interest of the enterprise he works for; and

"(6) who is compensated for his services on a fixed basis (by day, week, fortnightly or longer periods) equivalent to a weekly salary of not less than $30 exclusive of board, lodging, or other facilities; or

"(B) Any employee (1) whose work complies with the requirements of Paragraph (a), Subsections (1) and (2) of this Article; and

"(2) who is compensated for his services on a fixed basis (by day, week, fortnightly, or longer periods) equivalent to a weekly salary of not less than $100, exclusive of board, lodging, or other facilities." [4]

Castellar could not therefore qualify as an "executive" during the period between January 15, 1952 and April 8, 1953. It should be noted that he was working at that time as overseer of Hacienda Buena Vista. Even assuming that in the discharge of that occupation he met the other requirements prescribed by Regulation No. 13, it is an undisputed fact that he was receiving a salary of less than $30 a week. This is sufficient to class him as a laborer or employee entitled to receive double pay (1) for hours worked in excess of eight during any 24-hour period, according to Decree No. 3; and (2) for work performed on the day of rest, under Act No. 289 of 1946.

 The defendant contends that Regulation No. 13 is void because in defining the term "executive" it imposes as an essential condition that the employee be compensated for

---

[4] By a regulation which also took effect on January 15, 1952, the Secretary of Labor adopted an identical definition of the term "executive" for the purpose of the exception established in § 19 of Act No. 379 of May 15, 1948 (Sess. Laws, p. 1254), and in § 5 of Act No. 289 of April 9, 1946 (Sess. Laws, p. 682) as amended by Act No. 130 of April 27, 1950 (Sess. Laws, p. 336). See 29 L.P.R.A. § § 271–88 and 295–99.

his services on a fixed basis equivalent to a weekly salary of not less than $30, exclusive of board, lodging, or other facilities. It alleges that the salary received by the employee "may be an index together with the other requirements enumerated [in the Regulation], but never an isolated and excluding requirement", for which reason the weekly-salary requirement is therefore arbitrary and illegal. In our judgment, its contention is without merit. The nature of the work performed by the employee constituted without doubt the principal test for determining whether he actually performs executive functions. For this reason, Regulation No. 13 includes, among other requirements, the following: (1) that the "primary duty [of the employee] consists of the management of the establishment . . . or of a . . . department or subdivision thereof"; and (2) that the employee "customarily and regularly directs the work of two or more other employees therein, or of a department or subdivision thereof." Yet, it is no less true that in a great majority of cases executives have more responsibilities and receive higher salaries than other subordinate employees. That is why the compensation earned constitutes an adequate test for determining whether an employee actually exercises executive functions. Certainly it does not seem arbitrary or unreasonable to require, as a condition *sine qua non* for an employee to be an "executive," that he be compensated on a fixed basis equivalent to a weekly salary of not less than $30, exclusive of board, lodging, or other facilities. See *Sun Pub. Co.* v. *Walling*, 140 F.2d 445, 449 (6th Cir. 1944), and *Walling* v. *Yeakley*, 140 F.2d 830, 832–33 (10th Cir. 1944).

This question is otherwise well settled in administrative law. No one can ignore that since 1940 there is a federal administrative regulation which defines the meaning of the terms "executives, professionals, and administrators" under the Fair Labor Standards Act. 52 Stat. 1060, 29 U.S.C.

§ 201 *et seq.* These three categories of employees are exempt from the minimum-wage and overtime-pay provisions, according to the provisions of § 13 (*a*) (1) of the Federal Act, but there it is expressly provided that those terms shall be "defined and delimited by regulations of the Wage and Hour Administrator." The provisions of the federal regulations on this matter are very similar to those contained in Regulation No. 13 of the Minimum Wage Board. See 5 F.R. 4077; 14 F.R. 7705, 29 C.F.R. § § 541.1–541.6. However, the federal regulation has always required, as a condition *sine qua non* to qualify as an "executive," that the employee be compensated on a fixed basis for his services: at the present time the weekly salary received can not be less than $55 for Puerto Rico and the Virgin Isles. See 3 C.C.H. Lab. L. Rep. § 23,301 *et seq.* And the well-established rule of the courts recognizes that all the provisions of the federal regulation are valid, both from the legal and from the constitutional point of view. See *Fanelli* v. *United States Gypsum Co.*, 141 F.2d 216 (2d Cir. 1944); *Sun Pub. Co.* v. *Walling*, 140 F.2d 445, 449 (6th Cir. 1944); *Walling* v. *Yeakly*, 140 F.2d 830, 832–33 (10th Cir. 1944); 3 C.C.H. Labor Law Reporter, § 25,210, and cases therein cited. Thus, it is easily determined that the attempt to challenge the validity of Regulation No. 13 of the Minimum Wage Board is academic.[5]

 The assignments of errors Nos. 3 and 4 deal with the defense of prescription which the defendant raised in the superior court. The question raised therein was that Castellar's claim for the period during which he worked as "timekeeper" (July 9, 1942 to April 27, 1949) had prescribed, pursuant to the provisions of § 1867 of the Civil

---

[5] Nor can there be any doubt as to the validity of the regulation adopted by the Secretary of Labor defining "executives, professionals, and administrators," who are not considered as laborers or employees under Act No. 379 of 1948 and Act No. 289 of 1946. See footnote 4 *supra.*

Code (1930 ed.). 31 L.P.R.A. § 5297.[6] Castellar commenced to work as "overseer" of Hacienda Buena Vista on April 28, 1949, and the original complaint in this suit was filed on January 19, 1955. Therefore, the question narrowed down to a determination whether the nature of the services of timekeeper which Castellar rendered to the defendant

---

[6] This section essentially provides:

"Actions for the fulfilment of the following obligations shall prescribe in three years:

" . . . . . . .

"(3) For the payment of mechanics, servants, and laborers the amounts due for their services, and for the supplies or disbursements they may have incurred with regard to the same.

" . . . . . . .

"The time for the prescription of actions referred to in the three preceding paragraphs shall be counted from the time the respective services have ceased to be rendered."

Section 32 of the new Minimum Wage Law of 1956 (29 L.P.R.A. Cum. Supp. 1958, § 246d) alters the limitation periods for actions to recover wages "under this act, under the mandatory decrees heretofore or hereafter approved pursuant to its provisions, under the orders promulgated by the Board, or under any contract, agreement or law." However, it does not apply to this case because in par. (e) it is provided that "The provisions of this section shall in no wise affect the cases already filed in court or that may be filed within one (1) year after this act takes effect."

The complete text of §32 reads as follows:

"(a) The right to institute an action to recover wages which an employee may have against his employer under this act, under the mandatory decrees heretofore or hereafter approved pursuant to its provisions, under the orders promulgated by the Board, or under any contract, agreement or law, shall prescribe upon the lapse of three years. For the purpose of the prescription of such action the time shall be reckoned from the date the employee ceased in his employment with the employer.

"(b) Where the employee is working with the employer, the claim shall include only the wages to which the employee may be entitled, or any score, during the last ten years immediately preceding the date on which he may institute the judicial action.

"(c) In the event the employee has ceased in his employment with the employer, the claim shall include only the last ten years immediately preceding the date of his ceasing.

"(d) In connection with the limitation of actions provided in this section, a change in the nature of the work of the employee shall not constitute a novation of the contract of hire.

"(e) The provisions of this section shall in no wise affect the cases already filed in court or that may be filed within one (1) year after this act takes effect."

varied fundamentally when he became "overseer" of Hacienda Buena Vista. In fact, we have consistently held that the three-year period fixed by subd. 3 of § 1867 of the Civil Code should begin to run as of the date in which, owing to substantial changes in the nature of the services, a novation takes place which terminates the original contract in order to give way to a new one, without taking into account the fact that the laborer continues in the service of the same employer. In this connection, it is necessary to consider all the terms and conditions of the employment: the work performed, the duties, the obligations, the compensation earned, etc. *Muñoz* v. *District Court*, 63 P.R.R. 226 (1944); *Avellanet* v. *Porto Rican Express Co.*, 64 P.R.R. 660 (1945); *Jiménez* v. *District Court*, 65 P.R.R. 35 (1945); *Valiente & Cía.* v. *District Court*, 68 P.R.R. 491 (1948); *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250 (1948); *Vicenty* v. *Corona Brewing Corporation*, 73 P.R.R. 131 (1952); *Peña* v. *Eastern Sugar Associates*, 75 P.R.R. 288 (1953); *Lebrón* v. *P. R. Ry. Lt. & P. Co.*, 78 P.R.R. 650 (1955); *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88 (1956); and *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647 (1956).

■ The trial court did not make any findings of fact on the terms and conditions of Castellar's employment while he was "overseer" of Hacienda Buena Vista. It simply set forth mere generalities, to wit: (1) that "from April 28, 1949 to April 8, 1953, the plaintiff continued to work for the defendant under the same prior employment agreement, but as overseer of Hacienda Buena Vista"; and (2) that "Castellar worked for the defendant . . . continuously and under one single employment contract from July 9, 1942 until April 8, 1953, when he was discharged, with the exception of two weeks . . . during which he was absent from work on account of illness." However, in its conclusions of law it stated the following: "From April 28, 1949 to January 15, 1952, the plaintiff was excluded from the laws, decrees, and regulations on hours and wages of Puerto Rico

because he was an 'executive,' pursuant to the ruling in *Correa* v. *Mario Mercado e Hijos*, 72 P.R.R. 77." This would seem to indicate that there was a substantial and effective change in the work performed by Castellar when he ceased as a "time-keeper" and became "overseer" of Hacienda Buena Vista, since the doctrine announced in the *Correa* case applies only to majordomos who have under their orders, and who direct, supervise, employ and dismiss other laborers who work on the sugar-cane plantations. But this inference vanishes when we consider the following conclusion of law, which is prima facie inconsistent with that pointed out before: "Since the plaintiff rendered continuous services to the defendant from April 9, 1942 to April 8, 1953, under a single employment contract, and *it not having been shown that the status of 'executive' acquired by the laborer in the period between April 29, 1949 and January 15, 1952, varied fundamentally his duties as an employee, or modified or revoked substantially the contractual agreement entered into between the parties*, we conclude that the claim has not prescribed, inasmuch as the plaintiff ceased to render services to the employer on April 8, 1953, and he had as of that date three years to make the claim." (Italics ours.)

It is to be noted, also, that the evidence introduced by the parties on the questions of fact raised by the defense of prescription was most inconsistent and antagonistic. We need not summarize it here. It will suffice to point out, for example, that seven witnesses for the defense testified that Castellar's duties as "overseer" of Hacienda Buena Vista were those of a *majordomo*. They testified that the latter had power to employ and to dismiss other workers, that he directed the agricultural work done by other employees, that a timekeeper was expressly under his orders, and that he was in charge of supervising all work done on the plantations. Yet, the plaintiff himself testified that he always performed the work of a timekeeper, even when he was sent

to Hacienda Buena Vista to work as "overseer." And there is oral and documentary evidence which, if believed by the trier, could show: (1) that the majordomos of the defendant did not appear on the payrolls nor on the "daily reports", but Castellar did when he was overseer of Hacienda Buena Vista; (2) that the majordomos were paid monthly or fortnightly, while Castellar was always paid by the week; (3) that only the timekeepers signed the "daily reports," and that Castellar signed the same when he was overseer; and (4) that Castellar earned $20 a month as timekeeper prior to April 28, 1949, and that he continued to receive the same compensation as overseer until January 21, 1953, shortly before he was discharged.

Thus, the determination of the facts which are essential to the decision of the question of prescription depends in this case on a test of credibility of the witnesses and on the value or force of their testimony. Evidently, the trial judge is in a better position than this Court to weigh as a whole the oral evidence and to determine the effect, if any, of the documentary evidence admitted. The situation would be different if the documentary evidence would by itself be sufficient to pass judgment on the facts in issue. In the case at bar, however, it is indispensable to "distinguish" the quality of the oral testimony, that is, to weigh its triviality, excellence, truthfulness, or falsity. This does not depend solely on the literal content of the testimony. In the record before us, the reactions of the witnesses in the course of the interrogatories are omitted or hazy: their demeanor, tone of voice, expressions, attitudes, hesitations, gestures of conviction or doubt, etc. These are "evanescent and intangible" elements of judgment which only the lower judge may capture by his special intuition and perspicacity, because he observes directly everything the witnesses do and say. See *Orvis* v. *Higgins*, 180 F.2d 537 (2d Cir. 1950); *Wolff* v. *Hernández*, 76 P.R.R. 608, 617–19 (1954); and *Carrión* v. *Treasurer of Puerto Rico*, 79 P.R.R. 350, 363–64 (1956). In any event,

without a knowledge of the facts that the lower court found proved, it is impossible to decide on appeal or review the question of law raised by the defense of prescription. In view of the circumstances present here, we honestly do not have a clear understanding of the pronouncement made by the lower court dismissing the defense of prescription. As pointed out above, not only were indispensable findings of fact omitted but also the judgment contains two conclusions of law which are prima facie conflicting.

Consequently, without escape or remission we must remand the case to the trial court with direction to specify the facts admitted and to enter such judgment as it deems proper on the question of prescription. See *American Surety Co. v. Izquierdo,* 75 P.R.R. 247 (1953) *People v. Heirs of Ramírez,* 73 P.R.R. 36 (1952); *Defendini v. Heirs of Pérez,* 73 P.R.R. 463 (1952), and the cases cited therein. *Cf.* also *Fogle v. General Credit,* 110 F.2d 128 (D.C. Cir. 1940); *Owen v. Commercial Union Fire Ins. Co. of New York,* 211 F.2d 488 (4th Cir. 1954); and 5 Moore, Federal Practice, § 52.06 (2d ed.). In rendering a new judgment, the superior court should consider only the questions of fact and law raised by the defense of prescription invoked by the defendant. The pronouncement that Castellar became an "executive" when he commenced to work as overseer of Hacienda Buena Vista, according to the doctrine announced in the *Correa* case *supra,* can not be disturbed for the purpose of allowing compensation to the plaintiff for the period between April 28, 1949 and January 15, 1952. This is so because the plaintiff did not appeal from the judgment originally rendered by the superior court in this case. However, the lower court is at liberty to re-examine *all* its conclusions of law for the purpose of passing upon the issue of prescription.

■■ The other errors assigned hardly call for discussion. According to the provisions of § 13 of Act No. 379 of 1948 (29 L.P.R.A. § 282) and § 25 of the Minimum Wage

Law of 1941 (29 L.P.R.A. § 236), there is no question that the defendant is bound to pay to the plaintiff, by way of penalty or liquidation of damages, a sum equal to the total salaries owed for extra hours worked in excess of eight during any 24-hour period or during the weekly day of rest provided by Act No. 289 of 1946 (29 L.P.R.A. § § 295–99). See *Tulier* v. *Land Authority*, 70 P.R.R. 249 (1949) ; *Peña* v. *Eastern Sugar Associates*, 75 P.R.R. 288 (1953) ; *Acosta* v. *Floor Coverings of P. R.*, 78 P.R.R. 467 (1955) ; *Encarnación* v. *Jordán*, 78 P.R.R. 481 (1956) ; *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88 (1956) ; and *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647 (1956).[7] Lastly, it would be futile to challenge the findings of fact of the superior court on the number of extra hours worked by Castellar while in the service of the defendant. There is nothing in the record which would furnish a basis for holding that such findings of fact, based on oral testimony, are clearly erroneous. According to Rule 43.1 of the Rules of Civil Procedure (which corresponds to the old Rule 52 of the Rules

---

[7] Act No. 379 of 1948 left in full force Decree No. 3. *Caguas Bus Line* v. *Commissioner of Labor*, 73 P.R.R. 690 (1952). Naturally, this does not mean that all the provisions of that Act do not apply to workers in the sugar industry. See the *Peña, Olazagasti,* and *Berríos* cases *supra.* The "liquidation of damages" provided in § 13 of Act No. 379 applies to all claims, for "compensation less than that fixed by this Act for regular hours and extra hours of work." (Sess. Laws 1948, pp. 1254, 1262; 29 L.P.R.A. § 282). And subd. (*e*) and (*f*) of § 4 of that Act provide that extra hours of work are: (1) "The hours that an employee works for his employer during the day of rest heretofore or hereafter fixed by law in the case of businesses and industries not subject to the closing of their establishments"; and (2) "The hours that an employee works for his employer in excess of such maximum working hours a day as the Minimum Wage Board may have fixed or may fix for the occupation, business, or industry in question." Otherwise stated, the said § 4 incorporates all the overtime provisions of Decree No. 3 and also the provisions on the day of rest of Act No. 289 of 1946. Hence, the liquidation of damages provided in § 13 of Act No. 379 of 1948, applies to all claims for extra hours under the said decree and for work performed during the day of rest under Act No. 289 of 1946. We have already held that such "penalty" is in order even though claim is made for periods of services prior to the effective date of the clause on liquidation of damages. See *Tulier* v. *Land Authority*, 70 P.R.R. 249 (1949).

of Civil Procedure) : ". . . We can not set aside such findings, based on the oral testimony which the trial court had under consideration, unless they are clearly erroneous. Otherwise stated, upon further consideration we are faced with this flexible rule which must always be applied strictly: inasmuch as the adequacy between the evidence and the findings of fact is not and can never be exact or mathematical, and, according to the circumstances of each case, it will be more or less adjusted, more or less rigorous, the only thing we can demand of the trial court is to stay within certain limits beyond which we could not properly speak of adequacy, even if it were lax, but of discordance or manifest error." *Carrión* v. *Treasurer of P. R.*, 79 P.R.R. 350, 363–64 (1956). See, also, *Martín* v. *Torres*, 79 P.R.R. 370 (1956) ; *Ochoa* v. *Cía. Ron Carioca*, 79 P.R.R. 810 (1957) ; and *Orozco* v. *Commonwealth*, 80 P.R.R. 587 (1958).

The judgment is set aside and the case remanded to the lower court for further proceedings consistent with this opinion.

Mr. Chief Justice Negrón Fernández and Mr. Justice Belaval did not participate herein.

